**CORPUS COMPANY et al.**

v.

**UNITED STATES.**

**C.D. 4390; Court No. 70/56261–19789, etc., against the decisions of the district directors of customs at the ports of New Orleans and Port Arthur.**

United States Customs Court.
Nov. 17, 1972.

Hinds & Meyer, Houston, Tex. (John K. Meyer, Houston, Tex., of counsel), for plaintiffs.

Harlington Wood, Jr.. Asst. Atty. Gen. (Robert Blanc, New York City, trial attorney), for defendant.

RE, Judge:

In these four related cases, which were tried jointly, plaintiffs seek to recover certain duties levied by customs officials upon the cost of repairs, made in foreign countries during the period 1966–1969, upon four vessels owned by plaintiffs. Plaintiff, Corpus Company, is the owner of the *Mediterranean Seal,* which was engaged in seismic exploration off the coasts of Australia, Africa, and southeast Asia. The *Mediterranean Seal* was absent from the United States for a period of 21 months. Plaintiff, Three R Trust, is the owner of the *Gulf Seal,* which was engaged in similar work in the Australia and Singapore areas. The *Gulf Seal* was absent from the United States for a 23-month period. Plaintiff, Seal Fleet, Inc. is the owner of two vessels, the *Atlantic Seal* and the *Arctic Seal,* which likewise were engaged in seismic research. These two vessels always worked together and, for a period of 39 months, engaged in research off the western coast of Europe, throughout the Mediterranean Sea, and off the eastern coast of North America. In the course of their voyages, each ship underwent repairs in a foreign port.

Though nominally different entities, the plaintiffs were in fact related and operated out of one office, calling themselves "Seal Fleet." Each ship possessed a Certificate of Registry and, according to unrefuted evidence, never engaged in foreign trade and was never intended to do so. Indeed, it is admitted that the vessels were at all times engaged exclusively in oceanographic research, and were intended to be engaged solely in oceanographic research. It is also clear that the vessels were not equipped to engage in trade. For example, two of the vessels, the *Atlantic Seal* and the *Arctic Seal,* were under contract to the United States Navy for oceanographic research before they were built, and were specially constructed to carry out the Navy's long-term oceanographic research project. They were devoted exclusively to that project from the moment they were built, and their itinerary was determined exclusively by the Navy. Furthermore, the design of the ships did not permit the carrying of cargo or of passengers other than the scientists of the research team.

Pursuant to section 466 of the Tariff Act of 1930, 19 U.S.C. § 257, duty was assessed on the cost of the repairs made on the four vessels at the rate of 50 per centum ad valorem. Section 466 of the Tariff Act of 1930, in effect prior to January 5, 1971, provided as follows:

"The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel

shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs."

In essence, plaintiffs claim that the 50 per centum repair duty provided for in section 466 does not apply to the four vessels in question since they were neither engaged in, nor intended to be engaged in foreign trade. Since the repairs made on the four ships do not come within the scope of section 466, plaintiffs sue to recover the duties that they maintain were illegally levied and exacted.

There is no factual issue before the court. The question presented is one of law and pertains to the applicability and construction of the pertinent statutory provisions: whether the repair duties prescribed in section 466 were intended to apply to the four oceanographic research vessels in question. For reasons hereinafter stated, this question is answered in the negative and plaintiffs' protests are sustained.

A reading of section 466 reveals that the repair duty required to be exacted, under the authority of that statute, applies to "repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade."

■ Legislation and judicial decision have defined "documented under the laws of the United States" as registered, enrolled, or licensed under the laws of the United States. 46 U.S.C. § 801; The Helori, 24 F.2d 710, 711–712 (W.D. Wash.1928). See 19 C.F.R. § 3.1(c) 46 C.F.R. § 66.03–9. Only with one of these three documents may a vessel be considered a vessel of the United States and entitled to the protection and other benefits pertaining to such vessels. 46 U.S.C. § 221; 19 C.F.R. § 4.0, 46 C.F.R. § 66.03–7.

The defendant urges that the duties were lawfully imposed since the four vessels were in fact documented to engage in foreign trade. Essentially, the defendant construes section 466 to mean that since the certificate of registry permits a vessel to engage in foreign trade, it is *documented* to engage in foreign trade, and the repairs are *ipso facto* dutiable.

Plaintiffs urge a "more sensible construction," and submit that the repair duty provision was passed to discourage the use of foreign ship repair facilities. Although the statute is based on the assumption that United States vessels engaged in foreign trade can have repairs made in the United States as easily as in foreign countries, Congress, in the very next section, recognized certain exceptions, and provided for the remission or refund of duties for certain necessary repairs. Hence section 467 of the Tariff Act of 1930, 19 U.S.C. § 258, provides that if the repairs became necessary to secure the safety and seaworthiness of the vessel, there would be a remission of the duty even though the repairs had been made in a foreign country. Plaintiffs consequently submit that the statutory purpose will not be served by assessing penalty duties "on these four vessels, whose work took them far from U.S. ports for an extended period of time and which had no opportunity to have their repair work done in U.S. ports."

Plaintiffs contend that an exception exists in favor of those vessels that do not engage in trade, notwithstanding the fact that their registrations entitle them to do so. They contend that the phrase "documented * * * to engage" means documented for the purpose of engaging in foreign trade. Although

neither conclusive nor entirely dispositive of the legal question presented, some guidance can be found in the several cases that have previously passed upon the matter.

In S. F. Bar Pilots Association v. United States, 64 Treas.Dec. 682, T.D. 46787 (Cust.Ct.1933), repairs were made upon a vessel just prior to its registration. The ship was intended to supply and receive pilots for vessels entering and leaving San Francisco harbor and, like the research vessels at bar, its construction and design precluded the carrying of cargo. The court, upon a showing "that the vessel was not intended to be used for any of the purposes named in the statute," 64 Treas.Dec. 685, ordered the refund of the duties. Although the holding was in part based upon the fact that the repairs were made before registration, the court, in upholding the plaintiff's contentions, established the importance of the employment and intended use to which a vessel is put in cases arising under section 466.

In Standard Dredging Co. v. United States, 69 Treas.Dec. 239, T.D. 48136 (Cust.Ct.1936), a case factually indistinguishable from the case at bar, repairs were made in a foreign country upon a dredge sailing under a certificate of registry. Although the dredge had no machinery with which to propel itself, and was towed from one position to another by tugboats, the court held that under both statutory and case law, it was clearly a "vessel" within the meaning of section 466. Again, as in the case of the vessels at bar, there was no room on board the dredge in which to carry passengers or to store cargo. In determining the nature of the actual and intended uses of the vessel, the court sought lexicographic authority and said that:

"Commerce and trade as found in the statute are to be construed in the ordinary signification of the words. Vessels are in such trade if they are the medium for the exchange of commodities of different countries, or

used for the transportation of passengers for hire. The use to which the dredge in question was put, cannot fairly be said to come within the ordinary common definition of a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade. It is clear, therefore, that the dredge Maracaibo is excluded from the terms of the statute assessing duty upon the cost of the repairs, and duty * * * was illegally taken by the collector." 69 Treas.Dec. 243.

The court thus squarely held that since the vessel, although registered, did not engage in foreign trade and was not intended to do so, it was not "documented" within the meaning of the pertinent repair statute. Its repairs, therefore, were not dutiable. The very position advanced by the government in the cases at bar, that registration *ipso facto* made foreign repairs dutiable, was considered by the court and was expressly rejected by the majority. Indeed, the government's argument is an attempt to revive the position taken by Judge Evans in his dissenting opinion in the *Standard Dredging Co.* case.

The precise argument that is made by the defendant in the present cases was presented to the Court of Customs and Patent Appeals in United States v. Western Operating Corp., 35 CCPA 71, C.A.D. 373 (1947). In that case, an oil tanker, at the time of the repairs, was operating under a certificate of registry to engage in foreign trade and in the whale fisheries. It proceeded to Sweden, and there was converted to a floating whale factory. Upon the vessel's arrival in New York, duty was assessed under section 466 upon the cost of repairs.

The Customs Court directed the collector of customs to reliquidate the entry and refund the duties assessed and collected upon the cost of the foreign repairs. Upon the appeal before the Court

of Customs and Patent Appeals, the government contended that "the vessel, having been registered under the laws of the United States, 'the possession of a certificate of registry *ipso facto established* her right to engage in foreign trade'; and 'the fact that the Ulysses did not actually engage in foreign trade and that the owners did not intend so to employ her, are irrelevant considerations.' [Italics quoted.]" 35 CCPA at 73–74.

The court disagreed with the government's contention as to the construction of the statute. In affirming the judgment of the Customs Court, the appellate court stated that:

> "Section 466 * * * does not expressly provide for the assessment of duty upon the cost of equipment and repairs incurred in a foreign port by a *registered* vessel. The statute is specific to the cost of such items incurred in a foreign port by vessels *documented* under the laws of the United States *to engage* in the foreign or coasting trade, *or* a vessel *intended to be employed* in such trade." 35 CCPA 73 (emphasis added).

Further discussion centered on the passage over 130 years ago of the forerunner of 46 U.S.C. § 280.[1] The court concluded that Congress, by the latter statute, had authorized whaling ships to sail under a certificate of registry and that such ships, by legislative exception, could not legally engage in foreign trade. It appeared clear to the court " * * * that the foreign trade and the whale fishery, from a legal standpoint and otherwise, are essentially different employments," 35 CCPA 78, and that a registration for the whale fisheries was not a registration for foreign trade. Whaling vessels with such a document were therefore excluded from the provisions of section 466.

Another whaling vessel was before the appellate court in United States v. American Whaling Co., Inc., 38 CCPA 164, C.A.D. 454 (1951). In that case, it was the company's custom to have the vessel overhauled in Norway before each voyage which culminated with the sale of the whale oil in New York. On the voyage in question, a cargo of whale oil was carried to England. However, it appears that the authorities in Washington and New York were consulted, and that permission to carry the cargo was granted. On the strength of the governmental permission and the holding in United States v. Western Operating Corp., 35 CCPA 71, C.A.D. 373 (1947), the court said that "[u]pon the record we do not think the *Frango* was engaged in or intended to engage in foreign trade." 38 CCPA at 169. Hence, the appellate court affirmed the judgment of the Customs Court which ordered the refunding of all duties assessed upon the cost of repairs.

■ All of the cases show clearly that the courts, in determining whether the cost of repairs statute applied, examined carefully the employment or use of the vessel and its intended use. In no case did documentation alone result in the automatic imposition of duties.

Plaintiffs have argued that by virtue of the passage of the Oceanographic Research Vessels Act, 79 Stat. 424, now 46 U.S.C. §§ 441–445, Congress has established an exclusion in favor of research vessels similar to that applicable to whaling vessels. The avowed purpose of this act (P.L. 89–99), passed in 1965 was:

> " * * * to recognize, as a matter of law, that oceanographic research vessels, and the people working aboard them, while being engaged in specialized scientific work in the marine sciences, must necessarily be treated un-

---

1. 46 U.S.C. § 280 provides as follows:

"Papers for vessels in whale fishery. All vessels which may clear with registers for the purpose of engaging in the whale fishery shall be deemed to have lawful and sufficient papers for such voyages, securing the privileges and rights of registered vessels, and the privileges and exemptions of vessels enrolled and licensed for the fisheries."

der our regulatory and safety laws as being of different categories than other vessels and their personnel engaged in the usual pursuits of commercial passenger and cargo carrying." H.R. Rep.No.599, 89th Cong. 1st Sess. (1965), U.S.Code Cong. & Admin. News, pp. 2383, 2384.

While this act was concerned also with the status of persons and not merely vessels, it is, nevertheless, an indication of legislative intent that oceanographic research vessels are not "deemed" to be engaged in trade or commerce. 46 U.S. C. § 443.

In 1970, *after* the events at bar, legislation was introduced to exempt shrimp boats from the 50 per centum repair duty. H.R. 16745, 91st Cong., 2d Sess. Acting on a Treasury Department recommendation, a Senate amendment, eventually adopted, extended this relief to noncargo-carrying special purpose vessels, which included barges, oil-drilling vessels, and *oceanographic* vessels. P.L. 91–654. The pertinent Senate Report states:

> "The committee believes that an exemption should be made for U.S. vessels primarily used for the catching of shrimp and other 'special service' vessels which also must stay away from U.S. ports for extended periods of time, from the 50-percent ad valorem duty imposed under section 3114 of the Revised Statutes of the United States." S.Rep.No.91–1474, 91st Cong. 2d Sess., (1970), U.S.Code Cong. & Admin.News, pp. 5910, 5912.

From this language the government infers that the repair duty statute *before* the 1970 amendment was fully applicable to oceanographic research vessels. However, it must be noted that this was merely in keeping with the opinion of the Treasury Department, the party defendant in the case at bar, that research vessels were subject to duty. *Id.* U.S.Code Cong. & Admin.News at p. 5911. Furthermore, the cited report is not a part of the legislative history of section 466 and, therefore, not pertinent

in determining the applicability of that section to the cases before the court.

 The meaning and effect of the cost of repairs statute would seem to be clear and unmistakable. Repair duty may be levied only upon vessels "documented under the laws of the United States *to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade.*" (Emphasis added.) Where a vessel does not engage in trade, is not intended to engage in trade, and indeed is physically incapable of engaging in trade, its repairs are not dutiable under section 466. Standard Dredging Co. v. United States, 69 Treas.Dec. 239, T.D. 48136 (Cust.Ct. 1936). Admittedly, oceanographic research vessels are not vessels engaged in trade, nor are they so intended. Repairs on such vessels are, therefore, outside the scope of section 466.

In view of the foregoing, it is the determination of the court that the repair duties under section 466 were never intended to apply to the vessels at bar. Hence, plaintiffs' requested relief to recover the duties paid is hereby granted.

Judgment will issue accordingly.